UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DONALD CONTENT,

                     Plaintiff,                                **DECISION AND ORDER**

      -against-                                        20 Civ. 5444 (PED)

POLICE OFFICER SHANE M. CURRAN
and POLICE OFFICER JONATHAN FISHER,

                     Defendants.
------------------------------------------------------------X
**PAUL E. DAVISON, U.S.M.J.**

     Plaintiff Donald Content alleges claims for false arrest and excessive force, pursuant to 42 U.S.C. §1983, arising from his encounter on September 1, 2018 with two Orangetown police officers, defendants Shane Curran and Jonathan Fisher. Dkt. #24 (Amended Complaint). This case is before me for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c). Dkt. #30. Presently before this Court are (1) defendants' motion for summary judgment (Dkt. #39) and (2) plaintiff's cross-motion for partial summary judgment on his false arrest claim (Dkt. 44).[1] For the reasons set forth below, plaintiff's motion is **DENIED** and defendants' motion is **GRANTED IN PART**.

## I. BACKGROUND

     The following facts are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York,

---

[1] Plaintiff did not file a Notice of Motion; rather, his cross-motion is incorporated within his Memorandum of Law in Opposition to defendants' motion.

from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions. Any disputes of material fact are noted.[2]

On September 1, 2018 at approximately 1:53 a.m., the Orangetown Police Department ("OPD") received a call complaining about a group of people playing loud music in a parking lot at the subsidized housing complex known as Nyack Plaza. Nyack Plaza was known to the OPD as a high-crime area. OPD Officers Curran and Fisher (in separate police vehicles) were dispatched; within five minutes, both officers arrived at Nyack Plaza at approximately the same time. They drove their vehicles into the rear parking lot off of Hudson Avenue, on the south side of Nyack Plaza. Both officers observed two males (Donald Content and Martel Warren) about 50-100 feet away, standing on a grassy patch next to the sidewalk between the apartment building and the rear parking lot. There were no other people in this area.

Officers Curran and Fisher exited their vehicles and approached Content and Warren. Officer Curran recognized Mr. Content from two prior arrests in 2017 and 2018. The officers told the two men about the noise complaint; the men denied playing loud music. The officers observed a small, portable table located near the two men; Mr. Content was closest to the table,

---

[2] Certain factual allegations in the parties' 56.1 statements, whether disputed or undisputed, have been omitted from the factual recitation because they are not germane to the issues presently before the Court. Additionally, undisputed facts drawn from the parties' 56.1 statements reflect facts either admitted by the opposing party or those deemed admitted due to the opposing party's failure to dispute them with citations to admissible evidence. *See* Local Civil Rule 56.1 ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). *See also Sanchez v. Karen Gardens Apartment Corp.*, No. 20 Civ. 4694, 2021 WL 2434317, at *1 n.2 (E.D.N.Y. June 15, 2021) ("[A] party's statement that it can neither admit nor deny an adversary's statement based upon the factual record is not a sufficient response to establish a disputed fact[.]") (citation omitted).

about two to six feet away from it. The officers saw a black, collapsible baton on the table, partially extended open about six to eight inches. Both officers recognized the baton as a police-style baton similar to the ones they carried. Officer Curran was aware that the baton constituted a per se weapon under New York Criminal Procedure Law § 265.01(1) (Criminal Possession of a Weapon in the Fourth Degree). Officer Curran picked up the baton and asked the two men who it belonged to; both men said they did not know. At approximately 2:07 a.m., Officer Curran arrested Content and Warren for criminal possession of the weapon. The men were handcuffed, searched and placed in the officers' vehicles (Mr. Content with Officer Fisher and Mr. Warren with Officer Curran). Officer Fisher believed that Mr. Content was intoxicated because his eyes were droopy and he lacked coordination and swayed a little as he walked to the officer's vehicle. At approximately 2:11 a.m., the officers radioed OPD that they were leaving Nyack Plaza en route to the police station with Mr. Content and Mr. Warren in custody.

It was a six- or seven-minute drive from Nyack Plaza to OPD. Plaintiff asserts that, during the trip, he told Officer Fisher that he was claustrophobic and could not breathe, and asked the officer to roll down the window. Dkt. #44-2, at 68-69.[3] Plaintiff claims that Officer Fisher, in response, told him "to just sit back and shut up" and did not roll down the window. *Id.* at 69. According to Officer Fisher, during the trip, he partially opened his driver's side window (because he likes the cold) and, after Mr. Content stated he was claustrophobic, Fisher also fully opened the rear passenger side window. Dkt. #44-5, at 68-69.

Upon arrival at OPD, Officer Fisher pulled into the "sally port" at the rear of the precinct

---

[3] Unless otherwise noted, citations to specific page numbers reflect document (not ECF) pagination.

via one of two bay doors. The "sally port" was a large, open, well-lit space. Fisher entered immediately after Officer Curran, who had entered via the other bay door. The bay doors closed behind them. According to plaintiff, upon arrival at OPD, he asked Officer Fisher if he would please remove the handcuffs. Dkt. #44-2, at 69-70. Then, according to plaintiff, Officer Curran exited his vehicle and came over to Fisher's vehicle; Fisher got out of the car. *Id.* at 70. Plaintiff asserts:

> Officer Shane [Curran] was playing with something in the front, I didn't know what it was until I felt the heat blasting. And I'm like, oh, man, he turned the heat on and the heat was like it got like 2,000 degrees inside the car. So then I'm screaming help me, please, let me out, I can't breathe. I said it like two or three times, like two times and then I felt like a million pins and needles in my eyes and I felt like a Boa Constrictor choking my neck and my heart felt like it was about to jump out of its chest. My heart was just beating so fast and hard, and then I remember seeing black dots and then I just remember waking up in the morning shackled to a bed butt naked with catheters and I.V.s and whatever the fuck happened.

*Id.* Plaintiff claims that he sat in the back seat of the car for an hour and a half, while Officer Fisher "kept wiping the sweat off my forehead because he knew I was in distress." *Id.* at 71. Fisher asserts that, upon arrival at OPD, he turned off his vehicle and waited while Officer Curran brought Mr. Warren into the booking area. Dkt. #44-5, at 73-74. Fisher claims he left the rear passenger window open. *Id.* at 74. According to Fisher, Mr. Content complained that he was claustrophobic and sweating, and that he "did not like being in the situation that he was in." *Id.* at 75. Officer Fisher observed that plaintiff was sweating and "didn't look happy" and thought he was experiencing "a little bit of anxiety" along with intoxication. *Id.* at 75-76. According to Officer Fisher, plaintiff then asked to be removed from the vehicle; Fisher exited the car, went around to plaintiff's side, opened the door and explained that he could not do that

until Officer Curran finished bringing Mr. Warren into the booking area. *Id.* at 77-78.

Both officers assert that Officer Curran was in the booking room with Mr. Warren for no more than ten minutes. Dkt. #44-5, at 77 (Fisher states that Curran was gone a total of about ten minutes); Dkt. #44-1, at 73 (Curran states he was in the booking room for five or ten minutes). According to Officer Fisher, he was talking to Mr. Content (with plaintiff's door open) when Officer Curran returned and, as Curran approached the car, Mr. Content stopped responding to verbal stimulus. Dkt. #44-5, at 78-79. According to Officer Curran, Fisher told him (upon his return to the sally port) that plaintiff was unresponsive, claustrophobic and may have passed out; the car door was open and plaintiff was seated in the car, slumped with his head down. Dkt. #44-1, at 71, 74-75. Officer Curran notified a supervisor and asked them to call an ambulance. The officers tried to alert Mr. Content with physical stimulus (light shakes and a sternum rub) but got no response. The officers pulled plaintiff out of the vehicle. Officer Fisher states that they laid plaintiff on the ground (Dkt. #44-5, at 80); Officer Curran states that they moved plaintiff onto the floor and propped him up against the car (Dkt. #44-1, at 76-77). Plaintiff remained handcuffed (with his hands behind him). His pulse was steady and strong, and he was breathing normally. The officers continued to talk to Mr. Content and give him light body shakes. The ambulance (with an EMT) and a paramedic SUV arrived in about five minutes (at approximately 2:37 a.m.).

According to the EMT report: Mr. Content was found "sitting up outside police car being held up by OPD officers" and was "responsive to painful stimuli and winces from the pain of the handcuffs." Dkt. #44-3, at 1. At approximately 2:48 a.m., plaintiff was transported by ambulance to Montefiore Nyack Hospital (arriving in the emergency room at approximately 3:00

a.m.). A lab test result at 4:15 a.m. revealed plaintiff's blood alcohol level was 0.13%. Dkt. #49-4, at 4. Plaintiff spent a total of four hours in the Emergency Department; the treating physician's clinical impression was "Alcohol [I]ntoxication." *Id.* at 6. Plaintiff was ambulatory and able to walk out of the hospital; he was discharged back into police custody. Later that morning, at approximately 11:00 a.m., plaintiff was arraigned on one felony count of third degree criminal possession of a weapon (N.Y. Penal Law § 265.02(1)) based upon possession of the baton and his previous felony convictions. Plaintiff was released on his own recognizance.[4]

On September 12, 2018, plaintiff returned to the emergency room at Nyack Hospital complaining of pain in both wrists and decreased sensation in two fingers on his right hand. Dkt. #49-4, at 2. Plaintiff reported that he had been arrested the previous week and brought to the emergency room, and stated "that he was handcuffed with his arms behind his back and he was lying on them while he was in the ER." *Id.* A physical examination was positive for tenderness and abrasions on both wrists. *Id.* Plaintiff was diagnosed with acute bilateral wrist contusions and abrasions. *Id.* According to plaintiff, the numbness in his fingers lasted "a month or two." Dkt. #44-2, at 102.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material within the meaning of Rule 56 where it "might affect the outcome of the

---

[4] The charge was later reduced to fourth degree criminal possession of a weapon (a misdemeanor) and was ultimately dismissed.

suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In determining whether the moving party has met its burden of proving that there are no genuine disputes of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quotation and citation omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996). On the other hand, summary judgment must be denied if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *See Anderson*, 477 U.S. at 250.

### III. DISCUSSION

A. False Arrest

"A section 1983 claim for false arrest is substantially the same as a claim for false arrest

under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). "Because one element of a false arrest claim under New York law is that the confinement was not otherwise privileged, the existence of probable cause for the arrest is a complete defense to an action for false arrest." *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) (internal quotation marks and citations omitted). "Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins*, 478 F.3d at 84-85 (internal quotation marks and citation omitted). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks and citation omitted).

Further, even absent probable cause, an arresting officer may be entitled to qualified immunity on a false arrest claim. "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). "Said differently, if the officer's conduct violated a right, we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions. If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken." *Loria v. Gorman*, 306 F.3d 1271, 1282 (2d Cir. 2002). Therefore, "even if a right is clearly established in certain respects, qualified immunity will still shield an officer from liability if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Zalaski*,

723 F.3d at 389 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In the context of a false arrest claim, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quotation marks and citation omitted). Finally, "[a]lthough a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, . . . if there is such a dispute, the factual questions must be resolved by the factfinder." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (internal citations omitted).

Here, plaintiff was arrested for criminal possession of the baton, under a theory of constructive possession. Both parties seek summary judgment on plaintiff's false arrest claim: defendants argue that probable cause—or at least arguable probable cause—supported plaintiff's arrest; plaintiff asserts that the officers lacked even arguable probable cause to arrest him because no reasonably competent police officer could have concluded that plaintiff constructively possessed the baton.

"Under New York law, a person constructively possesses tangible property when he or

she exercises dominion and control over the property with a sufficient level of control over the area in which the contraband is found." *Smith v. DeGirolamo*, No. 17 Civ. 5532, 2020 WL 5752226, at *8 (E.D.N.Y. Sept. 25, 2020) (quotation marks and citations omitted). In other words, "[c]onstructive possession exists when a person has the power and intention to exercise dominion and control over the contraband in question[.]" *United States v. Willis*, 14 F.4th 170, 181 (2d Cir. 2021) (quotation marks and citation omitted), *cert. denied sub nom. Pierce v. United States*, 142 S. Ct. 2660, 212 L. Ed. 2d 613 (2022). "Constructive possession may be shown by direct or circumstantial evidence, and possession of the item need not be exclusive." *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019) (quotation marks and citation omitted). "Mere presence at the location of contraband does not establish possession." *United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016) (quoting *United States v. Rios*, 856 F.2d 493, 496 (2d Cir.1988)). "However, presence under a particular set of circumstances from which a reasonable jury could conclude that the defendant constructively possessed contraband located there can support a conviction." *Id.* (quotation marks and citation omitted). "Courts have found a variety of factors and circumstances relevant to determining whether a person constructively possessed contraband, including possession of a key to the location where the contraband is located, the presence of the contraband in plain view, and the availability of identification showing that the person resided where the contraband was." *Williams v. Johnson*, No. 17 Civ. 2351, 2019 WL 1437820, at *4 (S.D.N.Y. Mar. 31, 2019). "Thus, whether constructive possession exists is a fact-intensive inquiry." *Id.*

Here, plaintiff emphasizes the principle that proximity, alone, is insufficient to establish constructive possession, and argues that defendants "offer no conduct on the part of the Plaintiff

to suggest that he had dominion and control." Dkt. #44, at 21 (ECF pagination). I disagree; the undisputed facts gave the defendant officers arguable probable cause to arrest plaintiff for criminal possession of the baton. At approximately 2:00 a.m., plaintiff and Warren were standing 50-100 feet from the parking lot, on the grass next to the sidewalk connecting the parking lot and an apartment building. There were no other people in this area. Plaintiff was no more than six feet away from a small, portable table upon which, in plain view, was the black, collapsible baton, partially extended open about six to eight inches. It was objectively reasonable, under these circumstances, for defendants to conclude that plaintiff constructively possessed the baton. The standard for determining constructive possession is fact-specific:

> This standard requires police officers to consider several factors and make a judgment call, and courts that have reviewed those judgment calls have come out in divergent ways. The very fact that courts disagree regarding what specific factual circumstances would be sufficient to find constructive possession demonstrates that the law is not well-settled. Defendants made a discretionary determination in a "gray area," and that kind of determination is protected by qualified immunity.

*Roberts v. City of New York*, No. 16 Civ. 5409, 2017 WL 4357291, at *8 (E.D.N.Y. Sept. 29, 2017); *accord*, *Lowe v. City of New York*, No. 17 Civ. 0906, 2020 WL 1536335, at *5 (E.D.N.Y. Mar. 31, 2020). Accordingly, defendants are entitled to qualified immunity on plaintiff's false arrest claim.

B. Excessive Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). A police officer's use of force "is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable in light of

the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir.) supplemented, 108 F. App'x 10 (2d Cir. 2004) (internal quotation marks omitted) (citing *Graham*, 490 U.S. at 397). The issue of objective reasonableness turns on a case-specific assessment of the facts and circumstances surrounding the particular use of force, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others and whether he actively resisted arrest or attempting flight to evade arrest. *See Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (citing *Graham*, 490 U.S. at 396). Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted). Further, a police officer may be liable for excessive force if he "gratuitously inflicts pain in a manner that is not a reasonable response to the circumstances." *Phelan v. Sullivan*, 541 F. App'x 21, 25 (2d Cir. 2013) (citing *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 124 (2d Cir. 2004)). Finally, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation omitted). "Thus, a plaintiff generally must prove he sustained some injury to prevail on an excessive force claim." *Hicks v. Vill. of Ossining*, No. 12 Civ. 6874, 2016 WL 345582, at *4 (S.D.N.Y. Jan. 27, 2016).

Here, defendants argue that they are entitled to summary judgment on plaintiff's excessive force claim for several reasons. First, defendants assert that there is no evidence that plaintiff ever complained that the handcuffs were too tight. Dkt. #47, at 14 (ECF pagination). However,

> a plaintiff asserting a claim for excessive force need not always establish that [he] alerted an officer to the fact that [his] handcuffs were too tight or causing pain. The question is more broadly whether an officer reasonably should have known during handcuffing that his use of force was excessive. A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled [his] distress, verbally or otherwise, such that a reasonable officer would have been aware of [his] pain, or both.

*Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019).

Second, defendants contend that there is no evidence that plaintiff's alleged wrist injuries were due to handcuffing or were anything other than *de minimis*. Dkt. #47, at 15-16 (ECF pagination). I disagree. According to the EMT report, plaintiff was "responsive to painful stimuli and winces from the pain of the handcuffs." Dkt. #44-3, at 1. Approximately ten days later, plaintiff sought treatment at Nyack Hospital's emergency room for pain in both wrists and decreased sensation in two fingers on his right hand. Dkt. #49-4, at 2. A physical examination was positive for tenderness and abrasions on both wrists. *Id.* Plaintiff was diagnosed with acute bilateral wrist contusions and abrasions. *Id.* According to plaintiff, the numbness in his fingers lasted "a month or two." Dkt. #44-2, at 102.

Finally, defendants assert that there is no evidence to support plaintiff's contention that the officers gratuitously inflicted pain in a manner which was unreasonable under the circumstances. Again, I disagree. Plaintiff asserts that, during the trip from Nyack Plaza to OPD, he told Officer Fisher that he was claustrophobic and could not breathe, and asked the officer to roll down the window. Dkt. #44-2, at 68-69. Plaintiff claims that Officer Fisher, in response, told him "to just sit back and shut up" and did not roll down the window. *Id.* at 69. Upon arrival at OPD, Officer Fisher was aware that plaintiff was claustrophobic, anxious and sweating (Dkt. #44-5, at 75-76) yet, instead of bringing him to booking first, the officers brought

in Mr. Warren and required plaintiff to wait in the vehicle. Further, according to plaintiff, before Officer Curran escorted Mr. Warren to booking, he came over to Fisher's vehicle and turned up the heat:

> Officer Shane [Curran] was playing with something in the front, I didn't know what it was until I felt the heat blasting. And I'm like, oh, man, he turned the heat on and the heat was like it got like 2,000 degrees inside the car. So then I'm screaming help me, please, let me out, I can't breathe. I said it like two or three times, like two times and then I felt like a million pins and needles in my eyes and I felt like a Boa Constrictor choking my neck and my heart felt like it was about to jump out of its chest. My heart was just beating so fast and hard, and then I remember seeing black dots and then I just remember waking up in the morning shackled to a bed butt naked with catheters and I.V.s and whatever the fuck happened.

Dkt. #44-2, at 70.

At bottom, based upon the record, a reasonable jury could conclude that the officers used excessive force and that plaintiff suffered physical injury as a result of the force used. Accordingly, defendants have not established that they are entitled to summary judgment on plaintiff's excessive force claim.

## IV. CONCLUSION

For the foregoing reasons: (1) defendants' motion for summary judgment is **GRANTED IN PART** and plaintiff's false arrest claim is dismissed; (2) defendants' motion for summary judgment is **DENIED** as to plaintiff's claim for excessive force; and (3) plaintiff's cross-motion for partial summary judgment is **DENIED**.

The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. #39).

The Court has scheduled a Pretrial Conference on September 9, 2022 at 11:00 a.m. in Courtroom 420.

Dated: July 22, 2022
White Plains, New York

**SO ORDERED.**

_____
PAUL E. DAVISON, U.S.M.J.